## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CURTIS T. BROWN,  #283-840           :

    Petitioner                              :

        v.                                   :      Civil Action No. PJM-05-2336

JAMES SMITH, WARDEN, *et al.*         :

    Respondents                          :

..o0o..

## <u>MEMORANDUM OPINION</u>

Before the Court is a pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed by Curtis T. Brown, a state prisoner incarcerated at the Maryland House of Correction-Annex, challenging his 1999 conviction for murder and a related handgun offense. Respondents James Smith, Warden of the Maryland House of Correction, and J. Joseph Curran, Jr., by their counsel, have filed a response in opposition.  Upon review of the pleadings, the Court finds no need for an evidentiary hearing.  <u>See</u> 28 U.S.C. Section 2254(e)((2)*;* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts*.*  For the reasons that follow, the Petition will be denied.

I.  Facts

The facts of the case were summarized by The Court of Special Appeals and are excerpted here in pertinent part:

On the morning of October 15, 1997, Joseph Jwan Johnson ("Jwan") was shot six or seven times outside Hamlet West Apartments.  He was taken to Maryland Shock Trauma where he was pronounced dead at 1:13 a.m.

Crystal Underwood testified that in October 1997, she lived in an apartment on Brook Way in Columbia. Jwan and Edward Randy Johnson ("Randy"), Underwood's brother, were also living at Underwood's apartment at the time at

Underwood's request after they had been involved in a fight with nine other individuals over a drug transaction. Additionally, Underwood's three children lived there and appellant, the father of Underwood's children, would stay at the apartment "now and then."

Underwood testified that appellant and Jwan "got along fine at first." Eventually, the relationship between Jwan and appellant deteriorated when appellant accused Underwood of having an affair with Jwan.

William Devon Wilson ("Devon") testified that around two or three o'clock on the afternoon of October 14, he and Jwan went to Underwood's apartment so Jwan could pick up clothing to wear to a mortgage class they planned to attend that evening. At the apartment, Devon waited downstairs while Jwan went upstairs to get his things, where appellant and Underwood were watching television. When Underwood left the room, appellant and Jwan argued and began fighting. Devon testified that he eventually got involved in the fight and grabbed appellant. Underwood testified that "Jwan had picked up a piece of wood and threatened to hit [appellant]...[appellant] was bleeding from somewhere in the face, the nose or the mouth." Additionally, both Devon and Underwood testified that Jwan got a knife from the kitchen and told appellant that he was dead, and appellant said the same words back to Jwan. At some point, Jwan dropped the knife and left with Devon when they realized that the police were coming. Devon testified that he and Jwan then went to his mother's house and then the mortgage class after they left Underwood's apartment.

Randy testified that he went to Underwood's apartment on October 14, after receiving a call from her on his cellular phone. At the time, Randy was carrying his ".45 Ruger" "in [his] pants." When Randy arrived at Underwood's, he learned of about the fight between Jwan and appellant. Randy testified that appellant "had a T-shirt over his fact; it had blood on it" and that appellant "was mad; he was angry." At this point, Randy told appellant to "come on," meaning "let's go find out what's going on. I was going to let them fight."

Randy testified that he and Brown took Underwood's car and "drove back into the city" looking for Jwan. They drove to Hamlet West Apartments because Randy knew Jwan's girlfriend, Kristine New, lived there. They saw New driving Jwan's car and followed her to see where she lived. They then went back to Brook Way and returned Underwood's car. Later that evening they went out again to look for Jwan. See id. at 4.

2

Randy testified that around ten o'clock, they parked outside New's apartment at Hamlet West and waited for Jwan by a dumpster. Later in the evening, while waiting for Jwan, Randy telephoned Charlotte Johnson from his cellular phone. Randy and appellant then saw Jwan's car pull into the parking area. Randy and appellant got out of their vehicle and appellant ran after Jwan.  Randy testified that he lost sight of appellant and then heard "about six" gunshots.  About two minutes later, appellant returned to the car and the two men drove off. According to Randy, appellant had the gun in his front pocket and admitted shooting Jwan.

Id.

* * * * * * * * * * *

As they were driving away from Hamlet West, Randy spoke to Paylor[1] on his cellular phone. Randy testified that Paylor asked who was with him, and that he gave the phone to appellant to speak with Paylor. Randy and appellant then returned to Underwood's apartment.  At this point, Randy paged a friend to pick him up at Underwood's.  Randy testified that he took the gun with him when he left, and hid it at his mother's house.

The State called a number of  witnesses to corroborate Randy's testimony. Charlotte Johnson testified that she spoke to Randy around eleven o'clock in the evening.  She further testified that Randy was in a car at the time and that Randy was with someone.

Id. at 5-6.

* * * * * * * * * * *

[Keisha Paylor] also testified that she spoke to Randy that evening around midnight because she wanted to know what he was doing. When Paylor asked Randy who he was with, Randy put appellant on the phone, and she spoke to him. She further testified that she had known appellant since February 1995, and that she recognized his voice.

Id. at 6.

II. Procedural History

On April 27, 1999, after a jury sitting in the Circuit Court for Baltimore County found Brown

guilty of murder and a related handgun offense, Petitioner was sentenced to life imprisonment for

murder and five years for the handgun conviction.[2]  He appealed his convictions to the Court of

---

[1]        Keisha Paylor is Randy Johnson's former girlfriend. Paper No. 11, Exhibit 3 at 7.

[2]        Petitioner's first trial ended in mistrial on September 24, 1998.  Paper No. 11, Exhibit 1 at 4.

3

Special Appeals of Maryland, arguing that: 1) the trial court abused its discretion when it denied his motion to dismiss counsel; 2) the trial court erred in concluding that he could not impeach a key prosecution witness on an issue of bias; and 3) the evidence was insufficient to sustain his convictions.  Paper No. 11, Exhibits 6, 7, & 8.  The Court of Special Appeals affirmed the convictions on February 4, 2000,  and the mandate issued on March 6, 2000.  See id. Exhibit 8. Petitioner filed for certiorari review in the Court of Appeals of Maryland, raising the same claims. See id.  Exhibit 9.  On June 7, 2000, the Court of Appeals denied certiorari review.

On or about June 5, 2001, Petitioner initiated post-conviction proceedings.  His first petition, filed pro se, was withdrawn without prejudice at a hearing held on September 10, 2001.  Petitioner's second pro se petition was withdrawn without prejudice on May 29, 2002.  Petitioner, represented by counsel,  filed a third application for post-conviction relief on June 6, 2002, which was dismissed without prejudice on December 4, 2002.

On December 20, 2002, Petitioner, through counsel, filed another petition for post-conviction relief alleging his trial attorney provided ineffective assistance by: 1) failing to cooperate with Brown during jury selection; 2) failing to develop that Brown's actions were the "result of rage with no cooling off period;" 3) failing to conduct proper cross-examination of Devon Wilson, Crystal Underwood, and Edward Johnson;  4) making comments detrimental and prejudicial to Brown in front of the jury;  5) failing to move in limine to suppress evidence that Brown helped pay for his co-defendant's attorney and that Brown was violent toward Crystal Underwood; 6) failing to object to fingerprint testimony given by Detective Jay Landsman; and 7) failing to file post-trial motions for a modification of sentence and for review by a three judge panel.  See id. Exhibit 14. Additionally, Petitioner raised the following allegations at the post-conviction hearing conducted on September 30, 2004: 8) trial counsel was ineffective for failing to investigate Errol Hunter and

Errol Hunter's statement to police; [3] 9) the prosecution knowingly used false testimony; 10) trial counsel was ineffective for failing to object to the false testimony of Keisha Paylor; and 11) there was prosecutorial misconduct based on failure to divulge financial arrangements with Crystal Underwood. See id. Exhibits 16 and 18. The post-conviction court denied relief in an opinion filed on October 19, 2004. See id., Exhibit 18.

Petitioner filed pro se for leave to appeal the denial of post-conviction relief, presenting the same eleven issues raised before the state post-conviction court. See id., Exhibit 19. The Court of Special Appeals of Maryland summarily denied Brown's application for leave to appeal by unreported opinion filed on August 10, 2005, and the mandate issued on September 13, 2005. See id., Exhibit 20.

III.  Claims Presented

In this petition for federal habeas corpus relief, Petitioner claims trial counsel was ineffective because he: 1) failed to cooperate with Brown during voir dire; 2) failed to effectively cross-examine witnesses; 3) made derogatory comments about Brown during closing argument; 4) failed to file motions in limine; 5) failed to object to Detective Landsman's testimony relating to the absence of his fingerprints on ammunition shell casings; 6) failed to secure the testimony of Errol/ Earl Hunter; 7) failed to file a motion for reduction of sentence and/or motion for review of sentence by a three-judge panel; and 8) failed to investigate whether the State had an undisclosed deal with Crystal Underwood.  Petitioner also claims: 9) appellate counsel rendered ineffective assistance by failing to challenge the trial court's two-part voir dire questions; 10) the prosecution failed to disclose its agreement with Crystal Underwood; and 11) the prosecution knowingly used false testimony and

---

[3]         Errol Hunter is also referred to as "Earl Hunter." See id., Exhibit 16 at 15.

evidence at trial. Paper No. 1 at 6-9.

IV.  Procedural Default

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.  See Rose v. Lundy, 455 U. S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  See  O'Sullivan v. Boerckel, 526 U. S. 838 (1999); 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed, the petitioner has no available state remedy. See Teague v. Lane, 489 U. S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. See Coleman v. Thompson, 501 U. S. 722, 749-50 (failure to note timely appeal); Murray v. Carrier, 477 U. S. 478 (1986) (failure to raise claim on direct appeal); Murch v. Mottram, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); Bradley v. Davis, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post- conviction relief). The procedural default doctrine bars consideration of a claim in a petition for habeas corpus absent a showing of cause and prejudice or actual innocence. See Murray, 477 U. S. at  495;  Wainwright v. Sykes, 433 U.S. 72, 86 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice.  See  Schlup v. Delo, 513 U. S.298, 314 (1995).   The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has

6

probably resulted in the conviction of one who is actually innocent." <u>Murray</u>,  477 U. S. at 496. [4]

V. Standard of Review

This  petition is subject to the provisions of the federal habeas statute, 28 U.S.C. § 2254, as amended, which provides a "highly deferential standard for evaluating state-court rulings." <u>Lindh v. Murphy</u>, 521 U.S. 320, 333 n.7. (1997); <u>see also</u> <u>Bell v. Cone</u>, 543 U.S. 447; 125 S. Ct. 847, 852 (2005) (stating habeas court's standard for evaluating state-court ruling is highly deferential).  A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or  2)  "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000),  Justice O'Connor explained that  a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Id</u>. at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether  the  state  court's  application  of  clearly  established  federal  law  was  objectively

---

[4] By order signed March 15, 2006, the Court granted Petitioner thirty days to reply to Respondents' assertions of procedural default.  Paper No. 12.  The Court subsequently granted Petitioner's motion to extend the time to file a reply to April 24, 2006.  Papers Nos. 13 and 14. Petitioner has not filed a reply.

unreasonable." Id. at 409-410.  Furthermore, when a state court has made a finding of fact, it is presumed to be correct and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## VI.  Analysis

A criminal defendant's right to effective assistance of counsel is protected by the Sixth Amendment to the United States Constitution. Constitutionally ineffective assistance of counsel claims are governed by standards established in  Strickland v Washington,  466 U.S. 668 (1984); see also Bell v. Cone, 535 U.S. 695, 698-99 (2002) (explaining the interplay between Strickland and 28 U.S.C. § 2254(d)).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show his attorney's performance fell below an objective standard of reasonableness and that he suffered actual prejudice. See  id. at  687.  To demonstrate actual prejudice, a petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694.  According to Strickland,  there exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in  scrutinizing counsel's performance.  See  id. at  688-89. Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. See id. at 697.  A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101(1955)).

In Bell v.Cone, the Supreme Court explained that in order to successfully bring an ineffective assistance claim in a § 2254 action a petitioner must:

> ...do more than show that he would have satisfied Strickand's test if his claim were being analyzed in the first instance, because under  § 2254 (d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the

state-court decision applied Strickland incorrectly. See Williams, supra. at 411 65 S. Ct. 363.  Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.

535 U.S. at 698-99

In this motion for federal habeas relief, Petitioner claims that trial counsel was deficient because he: 1) failed to cooperate with Brown during voir dire; 2) failed to effectively cross-examine witnesses; 3) made derogatory comments about Brown during closing argument; 4) failed to file motions in limine; 5) failed to object to Detective Landsman's testimony relating to the absence of his fingerprints on ammunition shell casings; 6) failed to secure the testimony of Errol/ Earl Hunter; 7) failed to file a motion for reduction of sentence and/or motion for review of sentence by a three-judge panel; and 8) failed to investigate whether the State had an undisclosed deal with Crystal Underwood.

The first seven of Petitioner's ineffective assistance by trial counsel claims were considered and rejected by the post-conviction court.   The post-conviction court said of these claims:

> ... unless Petitioner can establish both prongs of the Strickland test, he is not entitled to post conviction relief.  Harris v. State, 303 Md. 685 (1984).  As well mere bald assertions are not adequate to grant post conviction relief.  Duff v. Warden, 274 Md. 646 (1964).
>
> The allegations of ineffective assistance of counsel, a-k, set forth in Petitioner's Motion for Post Conviction Relief are without merit. as Petitioner has failed to show that his trial counsel was deficient or that Petitioner was prejudiced in any way. The allegations of error are merely bald assertions that have not been supported by testimony taken during this proceeding or by the record created in previous proceedings.  To the contrary, a review of the record reveals that Mr. Steven Scheinin represented Petitioner competently at trial.

The court then considered Petitioner's claims individually.

1. Failure to Cooperate

The state court characterized this claim as a "bald assertion," and stated:

> At the hearing, Petitioner testified that there were certain individuals who he thought should have been struck and Mr. Scheinin disagreed. Mr. Scheinin used his judgment and experience, as a lawyer to determine which individuals should be stricken. It was Mr. Scheinin's job, as a criminal defense attorney to use and rely on his judgment and experience when making these types of decisions. This allegation is without merit.

Paper No. 11, Exhibit 18 at 4.

2.   Cross-examination of State's Witnesses

The post-conviction court determined this claim without merit, stating: "After review of the transcript it is evident that Mr. Scheinin skillfully and adequately cross-examined the State's witnesses. Petitioner also recognized Mr. Scheinin's skill as apparent by his letter to Mr. Scheinin, State's Exhibit 1." [5] Id. at 6.

3.   Detrimental Statements to the Jury

Petitioner faults his attorney with making detrimental and prejudicial statements to the jury. Specifically, during closing argument, trial counsel said of his client, "...just because you have an attitude like that does not mean you are a murderer." Paper No. 11, Exhibit 3 at 39.   "But just because a person loses their temper, just because they are rude, the next logical step is not that they are going to kill someone." Id. at 40.

In regard to Petitioner's claim, the state court determined:

> As recognized by the Petitioner in a letter he sent to Mr. Scheinin, " the absolutely most damaging witness during my trial was ME." See Letter from Petitioner to Mr. Scheinin, State's Exhibit 1. Based on the impression Petitioner conveyed to the jury, Mr. Scheinin tried to use this impression to his advantage

---

[5]     Introduced into evidence at the post- conviction hearing was a letter written by Petitioner to his trial counsel thanking him for his representation, indicating counsel had done "a good job' and stating "the most damaging witness during my trial was me." Paper No. 11, Exhibit 16 at 80-81.

during closing arguments.  During closing arguments, Mr. Scheinin  incorporated Petitioner's demeanor into a defense tactic.  Mr. Scheinin stated " just because you have an attitude like that does not mean you are a murderer." This was a tactical decision made by Mr. Scheinin. This is not error.

Id. at 6-7.

4.  Failing to File Motions in Limine

Noting that trial counsel testified at the post-conviction hearing that he tactically chose not

to file any pre-trial motions in limine, the Circuit Court for Baltimore County rejected this claim,

stating: "Mr. Scheinin testified that he evaluated his chances of success on such motions to be small.

He did not want to call the court's attention to the matter. This was not error." Id. at 7.

5.  Failure to Object to Detective Landsman

In regard to this claim, the post- conviction court said:

> Petitioner alleges that trial counsel was ineffective for failing to object to Detective Landsman testifying as an expert regarding fingerprint evidence. Specifically, Petitioner is objecting to Detective Landsman's testimony when he testified as to why no fingerprints were recovered from the gun. Detective Landsman testified that it was his experience that fingerprints are often not found on a fired gun because the explosion of gunpowder obliterates any prints.  An attorney's failure to object to a line of questioning is a trial tactic and thus not appropriate for review on a Petition for Post Conviction Relief. See Burger v. Kemp, 483 U.S. 776, 795 (1987). Furthermore, Petitioner was not prejudiced as a result of this testimony. No fingerprints of the Petitioner were found. Petitioner's only argument at the hearing was that he could "spin" this evidence into an argument that "the state could have done more."  This evidence was not damaging to Petitioner and at most was neutral evidence. However, this type of trial tactic is not appropriate for review on post conviction relief.

Id. at 7-8.

6.  Failure to file Post-Trial Motions

Trial counsel testified at the post-conviction hearing that he and Petitioner discussed

available post-trial proceedings.  Trial counsel testified Petitioner "did not indicate that he wanted

me to pursue anything other than I believe he asked that the case be appealed to the Court of Special

11

Appeals."   Paper No. 11, Exhibit 16 at 85.   Based on trial counsel's testimony, the state post-conviction court ruled "... this Court is convinced that Petitioner never asked Mr. Scheinin to file a Modification of Sentence or other post-trial motions, other than a direct appeal which Mr. Scheinin did. This is not ineffective assistance of counsel."

     7.   Failure to Investigate Errol Hunter and his Statement to Police

At the post-conviction hearing, Petitioner claimed trial counsel was deficient for failing to subpoena Errol Hunter as a witness.   The court rejected this contention stating as follows:

> In fact, Mr. Scheinin made numerous attempts to secure Mr. Hunter for trial.  Mr. Scheinin called Mr. Hunter's address, he spoke to various individuals in the area of Mr. Hunter's home and inquired into Mr. Hunter's whereabouts. Mr. Scheinin also asked the State to help him locate Mr. Hunter.  Thus despite the fact that both the State and Mr. Scheinin were trying to locate Mr. Hunter, Mr. Hunter was not present at Petitioner's trial.
>
> Notwithstanding, it is unclear whether Mr. Hunter's testimony would have in fact been helpful to the defense. It was acknowledged by both Petitioner and the State that there was a lot of controversy surrounding Mr. Hunter and his testimony. Thus, for Petitioner to allege that Mr. Scheinin was ineffective for failing to subpoena an individual whom he had not had a chance to meet and/or discuss the case with, whose testimony may or may not have been beneficial to the defense and who could not be located by either the State or defense is ridiculous. Where would the subpoena have been served upon Mr. Hunter when no one knew where he was? This is not ineffective assistance of counsel.

Id. at 8-9.

    The post-conviction court's conclusions are objectively reasonable, given the trial record and the testimony  presented at the post-conviction  hearing. As such, the post-conviction court's findings are deemed presumptively correct, pursuant to 28 U.S.C. §2254(d) and (e). Ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. See Stamper v. Muncie, 944 F. 2d 170, 178 (4th  Cir. 1991).  Also, choice of witnesses is a tactical decision to be made by trial counsel. See Bunch v.

<u>Thompson</u>, 949 F.2d 1354, 1364 (4th Cir.1991). Petitioner fails to allege, and the record does not suggest, that any of the asserted deficiencies by trial counsel prejudiced the outcome of the proceedings against him. The state court did not unreasonably apply <u>Strickland</u> by rejecting these claims, and federal habeas relief is not warranted as to the first seven claims presented.

        8. Failure to Investigate whether Crystal Underwood had a Undisclosed Deal

        Petitioner failed to present this claim to the state post-conviction court. Accordingly, the claim trial counsel failed to investigate whether the State had an undisclosed deal with Crystal Underwood is procedurally defaulted.

        9. Ineffective Assistance of Appellate Counsel

        Petitioner did not present this claim to the state post-conviction court. Accordingly, the claim that appellate counsel was ineffective for failing to raise on appeal the trial court's use of "impermissible compound questions during voir dire" is procedurally defaulted.

        10. Prosecution Failed to Disclose Agreement with Crystal Underwood

        At trial, the state prosecutor informed the Court that Crystal Underwood had "moved largely as a result of her fear of retaliation from the Defendant. We did offer her financial assistance in helping her move, a minimal amount." Paper No. 11, Exhibit 3 at 2. In the instant claim, Petitioner does not allege a violation of federal or constitutional law. Absent a violation of a federal constitutional right or federal law, a claim is not cognizable in a 28 U.S.C. § 2254 proceeding. <u>See</u> 28 U.S.C. § 2254(a); <u>Spencer v. Murray</u>, 18 F.3d 237, 239-40 (4th Cir. 1994).

        Pro se petitions, however, are construed liberally and held to a less stringent standard than those drafted by attorneys. <u>See</u> <u>Haines v. Kerner</u> 404 U.S. 519, 520 (1972). To the extent Petitioner

might have intended to allege a <u>Brady</u> [6] violation, the state post-conviction court considered the question of an arrangement between Crystal Underwood and the State in the context of a claim of prosecutorial misconduct.  The post-conviction court concluded: "... there is no evidence that any financial arrangement even existed between the State and Crystal. There is also no evidence that the State suppressed any information relating to Crystal. No evidence was presented at the hearing of any financial arrangement or any suppression of information by the State." Paper No. 11, Exhibit 18 at 10.

The findings of the state court are presumed correct. <u>See</u> 28 U.S.C. § 2254(e)(1).  The record does not show that the State offered Crystal Underwood financial compensation in exchange for her testimony, but rather was provided assistance to relocate to another state out of fear of retaliation from Petitioner.  Further, the relocation assistance was disclosed to defense counsel, not suppressed. Finally, because defense counsel successfully impeached Crystal Underwood's testimony at trial by highlighting inconsistencies between her trial testimony and statements she had made to the police and to the Grand Jury and by introducing evidence she had received probation before judgment on a charge of false statement to a police officer,  Paper No. 11, Exhibit 3 at 62-74,  Petitioner cannot show a reasonable probability of prejudice.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (quoting <u>United States v. Bagley</u>, 473 U.S. at 682).  This claim, even if it were cognizable, provides no basis for habeas relief.

---

[6]      In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  To establish a constitutional violation predicated on <u>Brady</u>, it must be shown: 1) the evidence was favorable to the accused; 2) it was suppressed by the State; and 3) the suppression prejudiced the defense at trial. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

11.   Prosecution Knowingly Used False Testimony and Evidence

In his final claim, Petitioner contends that the prosecution knowingly used the false testimony of Keisha Paylor.  At trial, Keisha Paylor testified that Petitioner's co-defendant Edward Johnson called her on a cellular telephone the night of the murder, said he was with Petitioner, and put Petitioner on the phone.  Paper No. 11, Exhibit 3 at 12.

Petitioner now claims that prosecution witness Jim Pawlik, a Sprint-Nextel Senior Investigator, who testified about cellular phone records introduced by the State into evidence proved that Paylor's conversations with Petitioner and Johnson could not have occurred on the night of the murder.[7]  Petitioner asserts the State knowingly fabricated this testimony.

The state post-conviction court rejected this claim as follows:

> Petitioner next allegation of error alleges that the State knowingly presented perjured testimony.  This allegation is in reference to the cell phone records and testimony of Keisha Paylor. There is no evidence in the record that the State knowingly offered perjured testimony.  There is no evidence that this collateral evidence was even considered by the State to be anything but truthful.

Paper No. 11, Exhibit 18 at 9-10.

Petitioner bears the burden of proving that the testimony was false and the prosecution was aware it was false.  See Thompson v. Garrison, 516 F. 2d 986, 988 (4th Cir. 1975).  Petitioner provided no evidence to the state post-conviction court, nor does he here, to show that the prosecution knowingly proffered perjured testimony or proof of misconduct of "sufficient significance to result in the denial of the defendant's right to a fair trial..." Bagley, 473 U.S. at 676 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)).  There is no evidence of deliberate

---

[7]        The trial transcript does not support Petitioner's allegations that Pawlik's testimony proved the telephone call could not have occurred.  Paper No. 11, Exhibit 3 at 79-103.

prosecutorial misconduct.   The state court's determination is fully supported by the record and is

not an unreasonable application of clearly established Supreme Court precedent. <u>See</u> <u>Williams v.</u>

<u>Taylor</u>, 529 U.S. at 412-13.   For these reasons, the claim fails to provide a basis for federal habeas

relief.

VII.  Conclusion

  For the above stated reasons, the Petition for Writ of Habeas Corpus will be denied.   An

Order consistent with this Memorandum Opinion follows.


<table>
<tr><td></td><td>/s/</td></tr>
<tr><td>DATE: 5/8/06</td><td>PETER J. MESSITTE<br>UNITED STATES DISTRICT JUDGE</td></tr>
</table>